UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
Tallahassee Division

ROBERT A. BRAYSHAW,

      Plaintiff,                        Case No. 4:09-cv-373-RS-WCS

v.

CITY OF TALLAHASSEE, FLORIDA,
and WILLIAM N. MEGGS, in his
official capacity as State Attorney,
Second Judicial Circuit, State of Florida,

      Defendants.

_____/

PLAINTIFF'S RESPONSE TO DEFENDANT MEGGS' MOTION TO DISMISS

For the reasons set forth below, defendant Meggs' Motion to Dismiss (Doc. 34) should be denied.

I.    INTRODUCTION.

By this action, plaintiff Brayshaw challenges the constitutionality of Fla. Stat. §843.17, which criminalizes the publication or dissemination of "the residence address or telephone number of any law enforcement officer while designating the officer as such,"  both on its face and as applied to his speech. First Amended Complaint, ¶27 (Doc. 22).

At the outset, plaintiff agrees his facial challenge to the statute is purely a question of law. The facial validity of the challenged statute is consequently subject to final determination at this stage of the litigation.

Statutes identical or nearly identical to the statute challenged here have all been declared violative of the First Amendment but the State defendant cites none of them. In any event, a finding of facial invalidity would resolve plaintiff's claims against the State defendant who was sued solely in his official capacity for injunctive and declaratory relief. Doc. 22, ¶7. As shown below, the statute is unconstitutional on its face. It should, consistent with the cases striking identical or nearly identical statutes, be declared facially invalid and its enforcement enjoined.

Meggs' motion fails to address plaintiff's second claim, namely that the statute is unconstitutional as applied to someone who, like him, merely posts publicly available address information about police officers.

II.    Fla. Stat. §843.17 is Facially Unconstitutional Because It Is Not Limited to the Narrow Exceptions for "True Threats," "Fighting Words," or "Words Likely to Incite Imminent Violence."

A.    Plaintiff's speech is protected by the First Amendment.

First, plaintiff was engaged in the publication of truthful information which was publicly available on the Internet.[1] Doc. 22, ¶13.  Second, plaintiff published his speech on a police accountability web site, "ratemycop.com."

---

[1]    He desires to continue to do so but has refrained from exercising his First Amendment rights out of fear of arrest and prosecution. Doc. 22, ¶¶21-23. Having been prosecuted twice under the statute, ¶15, this fear is certainly credible. *See also* ¶18: "defendant Meggs' office would again prosecute plaintiff if he publishes the name of any ... police officer and their address or telephone number under the same or similar circumstances ... ."

Web sites such as these address matters of public concern, namely the accountability of public officials (in this case Tallahassee Police Department officers) and their demeanor during the course of their official duties. First Amended Complaint, Doc. 22, ¶¶8-12. *See Sheehan v. Gregoire*, 272 F.Supp.2d 1135, 1139, n. 2, 1145 (W.D. Wash. 2003) (noting that plaintiff's website on police accountability "communicates truthful lawfully-obtained, publicly-available personal identifying information with respect to a matter of public significance"). This website is "analytically indistinguishable from a newspaper." *Id*. at 1145. *See also Reno v. ACLU,* 521 U.S. 844, 870 (1997) ("[O]ur cases provide no basis for qualifying the level of First Amendment scrutiny that should be applied to this medium [of the internet].").[2] This discussion of matters of public concern includes the publication of names and addresses of police officers or others. *Sheehan,* 272 F.Supp.2d at 1139, n.2;

---

[2]     As noted in *Ostergren v. McDonnell*, 2008 WL 3895593 *9, n.3 (E.D. Va., August 22, 2008):

> Indeed, it might be said that the Internet has taken over the role of traditional print media. It can hardly be contested that there is an ongoing shift away from traditional print media toward the internet. *See* John Ibbitson, *Extra, extra, read all about it--or, sadly, not,* The Globe and Mail, July 9, 2008, at A13 (describing year over year nationwide decline in newspaper circulation and decreased ad revenues as readers turn to the internet without coordinate advertiser migration); Annys Shin, *Newspaper Circulation Continues to Decline,* The Washington Post, May 3, 2005, at E03 (describing how that year's decline "continued a 20-year trend in the newspaper industry as people increasingly turn to other media such as the Internet and 24-hour cable news networks for information.").

*City of Kirkland v. Sheehan*, 2001 WL 1751590 *6 (Wash. Super. 2001) (publication of "names, addresses, birthdates, telephone numbers, ... and other personal information concerning law enforcement personnel and their relatives"). The *Sheehan* court concluded:

> In this case, as in numerous others, in the absence of a credible specific threat of harm, the publication of lawfully obtained addresses and telephone numbers, while certainly unwelcome to those who had desired a greater degree of anonymity, is traditionally viewed as having the ability to promote political speech. Publication may arguably expose wrongdoers and/or facilitate peaceful picketing of homes or worksites and render other communication possible.

*Id. Accord, U.S. v. White*, 638 F.Supp.2d 935, 957-8 (N.D. Ill. 2009) (publication of name, address and phone numbers – home, cell and office – of jury foreperson in highly publicized trial constitutionally protected). *See also* Eugene Volokh, *Crime-Facilitating Speech*, 57 Stan. L. Rev. 1095, 1142-43 (2005) (discussing how the publishing of names and addresses can help people evaluate and participate in public debate, as well as facilitate lawful remonstrance and social ostracism). And it includes the re-publication of information already in the public arena. *See also*: *Ostergren v. McDonnell*, 643 F.Supp.2d 758 (E.D. Va. 2009) (republication of publicly obtainable documents containing un-redacted social security numbers of Virginia legislators and Virginia clerks of court is constitutionally protected).

Thus, Fla. Stat. §843.17 which criminalizes the publication or dissemination of "the residence address or telephone number of any law

enforcement officer while designating the officer as such" must be viewed through the lens of the First Amendment.[3]

B.      THE POWER OF GOVERNMENT TO CRIMINALIZE SPEECH HAS BEEN NARROWLY CONSTRAINED TO THREE EXCEPTIONS: 1) FIGHTING WORDS, 2) ADVOCACY LIKELY TO INCITE OR PRODUCE IMMINENT LAWLESS ACTION, AND 3) TRUE THREATS OF VIOLENCE.

The First Amendment provides that "Congress shall make no law … abridging the freedom of speech … ."[4] The power of government to criminalize speech has been carefully and narrowly constrained by the Supreme Court. *See*, *e.g., Chaplinsky v. New Hampshire,* 315 U.S. 568, 571-2 (1942) ("There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem").

Thus, for example, a State may punish those words "which by their very utterance inflict injury or tend to incite an immediate breach of the peace." We have consequently held that fighting words – "those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common

---

[3]      Defendant Meggs offers no analysis regarding the speech at issue in this litigation, simply dismissing it out of hand: "[t]here can be no legitimate or newsworthy purpose to be served by publishing the officer's name, residence address and phone number." Doc. 34 at 2-3. *See also id*. at 4-5: "there is nothing that can be deemed 'newsworthy' about this type of information." "Newsworthiness" is not the test for protection of truthful information under the First Amendment, and the State defendant provides no authority for that assertion.

[4]      The First Amendment applies to state and local governments under the Due Process Clause of the Fourteenth Amendment. *See Board of Ed., Island Trees Union Free School Dist. No. 26 v. Pico*, 457 U.S. 853, 855, n. 1 (1982), and cases cited therein.

knowledge, inherently likely to provoke violent reaction" – are generally proscribable under the First Amendment. Furthermore, "the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." And the First Amendment also permits a State to ban a "true threat."

*Virginia v. Black*, 538 U.S. 343, 359 (2003) (citations omitted).[5] But even where a statute plainly encompasses one of these exceptions, the statute "must be interpreted with the commands of the First Amendment clearly in mind." *Watts v. United States*, 394 U.S. 705, 707 (1969) (viewing statute criminalizing threats against the President of the United States, concluding that only a "true threat" can be criminalized). Thus, Florida's statute must be evaluated to determine whether it facially proscribes only that speech which may constitutionally be proscribed.

C.    FLORIDA'S STATUTE DOES NOT PASS CONSTITUTIONAL MUSTER.

---

[5]    There are, of course, other categories of speech that may be constitutionally constrained, such as defamation, obscenity and child pornography, none of which are relevant here. Plaintiff notes that even in these areas, the Supreme Court has narrowly construed what may be proscribed. *See*, *e.g.*: *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 13-17 (1990) (outlining narrowing constructions of speech to which defamation may be constitutionally applied); *Miller v. California,* 413 U.S. 15 (1973) (narrowing definition of obscenity that may be proscribed); *Ashcroft v. Free Speech Coalition,* 535 U.S. 234, 255 (2002) (holding statute that banned "virtual" child pornography unconstitutional, stating that "Government may not suppress lawful speech as the means to suppress unlawful speech. Protected speech does not become unprotected merely because it resembles the latter.").

1.   THE STATUTE PUNISHES SPEECH WHICH DOES NOT FALL INTO ANY CATEGORY RECOGNIZED BY THE SUPREME COURT AS UNPROTECTED BY THE FIRST AMENDMENT.

The words prohibited by the statute challenged here – addresses and telephone numbers in conjunction with the name of a law enforcement officer – are not "fighting words." Police officers utter those words in the course of daily life to merchants, creditors, and the like. Nor is there any suggestion that uttering this information would be likely to incite imminent lawless action. Nor are they "true threats."

Defendant Meggs asserts that the "purpose of the statute is clear from its face. It is designed in part to prevent a 'get back' at a law enforcement officer by intimidating him or her by putting the officer and family in fear of harassment, retaliation and other forms of intimidation." Doc. 34 at 2.[6] The unstated assumption in this assertion is that the publication or

---

[6]     Defendant Meggs later asserts that "[i]t can easily be said that publishing the name, residence address and telephone number of a law enforcement officer *places that person … at peril.*" *Id.* at 7-8 (emphasis added). Similarly he asserts that "[p]rotecting law enforcement officers and their families from intimidation, harassment and threats – *including preventing them from fear of having their lives threatened* – and preventing law enforcement officers from being less than vigilant in the performance of their duties to protect and preserve the public safety and general welfare, are compelling state interests." *Id.* at 8-9 (emphasis added). Yet the challenged statute does not require any credible threat that an officer's life is being placed in any danger whatsoever or that there be any credible fear of violence as a result of the proscribed speech. While the State of Florida could constitutionally proscribe true threats against public officials – *see*, *e.g.*, *Watts v. United States*, 394 U.S. 705 – Fla. Stat. §843.17 does not do that.

dissemination of an officer's address or phone number, together with the *intent* to intimidate, hinder, or interrupt the officer in the performance of his or her duties constitutes a threat that is punishable. But a "true threat" that may be proscribed consistent with the First Amendment simply does not turn on the subjective intent of the speaker:

> "True threats" encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats "protect[s] individuals from the fear of violence" and "from the disruption that fear engenders," in addition to protecting people "from the possibility that the threatened violence will occur." Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death.

*Virginia v. Black*, 538 U.S. at 359-60 (citations omitted). *See also, NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 929 (1982) (publicly reading the names of persons who disregarded a boycott and threatening that they would be "disciplined" and saying "we're gonna break your damn neck" could be viewed as intending to create a fear of violence but was not sufficient to grant relief because the speaker had not thereby "authorized, ratified or directly threatened" acts of violence). And the threat must be measured from an objective, reasonable person standard – that is, would a reasonable person construe the communication to be a true threat? *See, e.g.: U.S. v. Alaboud*,

347 F.3d 1293, 1297 (11th Cir. 2003); *United States v. Callahan*, 702 F.2d 964, 965 (11th Cir. 1983).

The Florida statute challenged here requires no true threat, only subjective intent of the speaker in publishing or disseminating the address or phone number:

> **Publishing name and address of law enforcement officer.** – Any person who shall maliciously, with intent to obstruct the due execution of the law or with the intent to intimidate, hinder, or interrupt any law enforcement officer in the legal performance of his or her duties, publish or disseminate the residence address or telephone number of any law enforcement officer while designating the officer as such, without authorization of the agency which employs the officer, shall be guilty of a misdemeanor of the first degree, punishable as provided in s. 775.082 or s. 775.083.

Fla. Stat. §843.17. This statute, on its face, punishes speech based upon the intent of the speaker and is devoid of a requirement of a "true threat" that could be proscribed consistent with the First Amendment.[7] Assuming that

---

[7]  The statute also punishes one who "maliciously" publishes or disseminates the proscribed information but does not define "maliciously." Where a Florida statute does not define "maliciously," it must be given its "plain and ordinary meaning." *Seese v. State*, 955 So.2d 1145, 1149 (Fla. 4th DCA 2007), *review denied*, 968 So.2d 557 (2007) (Table No. SC07-1316).

> In law the term *malice* and its adverbial form *maliciously* have two meanings: "legal malice" (also known as "malice in law"), and "actual malice" (also known as "malice in fact"). Legal malice means "wrongfully, intentionally, without legal justification or excuse," while actual malice means "ill will, hatred, spite, an evil intent."

*Id*. Neither of these definitions changes the legal analysis because neither requires a "true threat" that may be proscribed consistent with the First

(footnote continued ...)

the Florida legislature *could* enact a statute that can be constitutionally applied to prohibit true threats, the current statute is substantially overbroad "judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973).

As defendant Meggs points out, Florida courts have not limited §843.07 to only publication or dissemination of the prohibited information in such a way as to constitute a "true threat" as construed by the Supreme Court. *See* Doc. 35 at 2: "The subject statute was enacted in 1972 and is unaccompanied by a single reported case."[8]

This Court cannot provide the necessary narrowing construction unless it is "readily susceptible" to such narrowing; nor can it "rewrite a state law to conform it to constitutional requirements." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 397 (1988). Federal courts do not sit as Councils of Revision. *U.S. v. Rutherford*, 442 U.S. 544, 555 (1979) ("Under our constitutional framework, federal courts do not sit as Councils of Revision, empowered to rewrite legislation in accord with their own conceptions of prudent public policy."). The Florida Supreme Court cautions likewise in interpreting

---

(... continued)
Amendment. Rather, they each state a form of subjective intent on the part of the speaker.

[8] Plaintiff notes that some of the significant Supreme Court cases cited herein were decided after the challenged statute was enacted. Florida's legislature thus lacked the Court's guidance and First Amendment analysis when it created §843.17.

Florida law. In invalidating a Tampa ordinance that prohibited loitering in a manner and under circumstances manifesting the purpose of engaging in solicitation for prostitution, the Court stated:

> We find that it is impossible to preserve the constitutionality of the Tampa ordinance without effectively rewriting it, and we decline to "legislate" in that fashion. Courts may not go so far in their narrowing constructions so as to effectively rewrite legislative enactments. Even if we were to find that the ordinance could be preserved facially by writing in requirements of specific intent to engage in prohibited activity and sufficient overt activity to clearly manifest that intent, the ordinance still would be subject to unconstitutional application. A series of adjudications limiting the application of the ordinance would be unacceptable because it would result in a chilling effect on protected speech during the pendency of judicial proceedings delineating the contours of the ordinance.

*Wyche v. State,* 619 So.2d 231, 236 (Fla. 1993) (citations omitted).

Narrowing is not possible here – no plain reading of the statute permits the court to interpret it narrowly so that it only reaches true threats that may be proscribed consistent with the First Amendment. Simply put, Fla. Stat. §843.17 criminalizes speech protected under the First Amendment and bans no category of speech that the Supreme Court has held may be proscribed. *See Virginia v. Black*, 538 U.S. at 359-60; *Watts v. United States*, 394 U.S. 705; *Sheehan v. Gregoire*, 272 F.Supp.2d 1135; *U.S. v. White*, 638 F.Supp.2d 935. The statute is facially unconstitutional.

> 2. THE STATUTE PUNISHES PUBLICATION OF INFORMATION WHICH IS PUBLICLY AVAILABLE AND DOES SO WITHOUT SERVING A STATE INTEREST OF THE HIGHEST ORDER.

"[S]tate action to punish the publication of truthful information seldom can satisfy constitutional standards." *Smith v. Daily Mail Publishing Co.,* 443 U.S. 97, 102 (1979). Thus, the Supreme Court has repeatedly ruled that "if a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest *of the highest order.*" *Id.* at 103 (emphasis added); *Bartnicki v. Vopper*, 532 U.S. 514, 527-28 (2001); *Butterworth v. Smith*, 494 U.S. 624, 632 (1990); *The Florida Star v. B.J.F.*, 491 U.S. 524, 533 (1989); *Landmark Communications, Inc. v. Virginia,* 435 U.S. 829 (1978); *New York Times Co. v. United States,* 403 U.S. 713 (1971) (government could not prohibit publication of the "Pentagon Papers" even though they were stolen by a third party).

That plaintiff is not a media representative is irrelevant: "the rights of the institutional media are no greater and no less than those enjoyed by other individuals or organizations engaged in the same activities." *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 784 (1985); *First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 802 (1978) ("In short, the First Amendment does not 'belong' to any definable category of persons or entities: It belongs to all who exercise its freedoms.") (Burger, C.J., concurring).

Here, the challenged statute simply does not <u>serve</u> "a state interest of the highest order." *Smith v. Daily Mail Publishing Co.,* 443 U.S. at 103. Two

articulated state interests may be gleaned from defendant Meggs' motion. First, defendant Meggs makes various assertions that ultimately reflect the state's interest in protecting law enforcement personnel from harm.[9] Second, defendant Meggs proffers that "[t]he decision to address this matter is well within the State's exercise of its police power … [and] [i]t does not require additional citations of authority to demonstrate that protecting those whose duty it is to enforce the law and protect the citizens from those who would violate them is the highest of police power exercises."[10] Doc. 34 at. 3. But while the protection of law enforcement officers from bodily harm or death may be a compelling state interest, or even an interest of the highest order,[11]

---

[9]    Three passages in Meggs' Motion to Dismiss outline this concern: "It is designed in part to prevent a 'get back' at a law enforcement officer by intimidating him or her by putting the officer and family in fear of harassment, retaliation and other forms of intimidation." Doc. 34 at 2. "It can easily be said that publishing the name, residence address and telephone number of a law enforcement officer places that person … at peril." *Id*. at 7-8. "Protecting law enforcement officers and their families from intimidation, harassment and threats – including preventing them from fear of having their lives threatened – and preventing law enforcement officers from being less than vigilant in the performance of their duties to protect and preserve the public safety and general welfare, are compelling state interests." *Id*. at 8-9.

[10]    This second articulated interest ultimately rests upon the first – protection of law enforcement officers. Clearly, the right of the State generally to exercise its police powers does not constitute an interest "of the highest order." Otherwise, given the breadth of the state's police powers, the exception swallows the rule.

[11]    The "lesser included" State interests articulated by defendant Meggs simply do not rise to the level of "an interest of the highest order" or even a compelling state interest. *See* n. 6 & 9, *supra*. "Preventing law

<span style="float:right">(footnote continued …)</span>

the challenged statute does not require that there be a credible threat that an officer's life will be placed in any danger whatsoever or that there be a credible fear of bodily harm or death because of the proscribed speech. While the State of Florida could constitutionally proscribe true threats against public officials,[12] §843.17 does not do that.[13] *See*, *e.g.*, *Watts v. United States*, 394 U.S. 705. *See also* Section II.C.1, *supra*.

---

(... continued)

enforcement officers from being less than vigilant in the performance of their duties," "fear of harassment," or "other forms of intimidation" fall short of any sort of true threat. *See*, *e.g.*, *U.S. v. White*, 638 F.Supp.2d at 958 ("an intimidating context alone does not remove the protection of the First Amendment"). Indeed, it is precisely these sorts of "State interests" that were found lacking in the defense of a myriad of Florida's statutes criminalizing or otherwise prohibiting the release of various information. *See*, *e.g.*: *See*, *e.g.*: *Butterworth v. Smith*, 494 U.S. at 626 (Florida statute prohibiting grand jury witness from disclosing his own testimony violated First Amendment); *Cooper v. Dillon*, 403 F.3d 1208 (11th Cir. 2005) (state cannot constitutionally punish speech revealing fact that an internal police investigation is underway and the facts underlying the investigation); *ACLU v. The Florida Bar*, 999 F.2d 1486 (11th Cir. 1993) (state cannot constitutionally prohibit a judicial candidate from "speak[ing] publicly about truthful information regarding his opponent, the incumbent circuit judge"); *Doe v. Gonzalez*, 723 F. Supp. 690, 695 (S.D. Fla. 1988) (statute that forbade complainant to reveal the contents of complaint filed with the Florida Commission on Ethics was unconstitutional, because our society's "foundation of self-governance requires that the speech prohibited by the Florida statute be not only tolerated, but encouraged"); *Doe v. Florida Judicial Qualifications Comm'n*, 748 F. Supp. 1520, 1526 (S.D. Fla. 1990) (statute prohibiting disclosure of the filing of ethics complaint against judge is unconstitutional).

[12]     The State of Washington amended its statute in an effort to do that following the district court's decision in *Sheehan*. *See* RCWA § 4.24.680 (1): "A person shall not knowingly make available on the world wide web the personal information of a peace officer … if the dissemination of the personal information poses an imminent and serious threat to the peace officer's … safety or the safety of that person's immediate family and the threat is

(footnote continued ...)

14

3.   *SHEEHAN V. GREGOIRE.*

The above principles were synthesized in *Sheehan v. Gregoire*, where the court  considered a statute providing:

> A person or organization shall not, with the intent to harm or intimidate, sell, trade, give, publish, distribute, or otherwise release the residential address, residential telephone number, birthdate, or social security number of any law enforcement-related, corrections officer-related, or court-related employee or volunteer, or someone with a similar name, and categorize them as such, without the express written permission of the employee or volunteer unless specifically exempted by law or court order.

272 F.Supp.2d. at 1139.

The plaintiff in *Sheehan* operated a website, www.justicefiles.org, which criticized police officers. In response to the statute quoted above, he removed personal identifying information about law enforcement officers, corrections officers and court employees and volunteers from his site, and then challenged the statute under the First Amendment. *Id.*

---

(... continued)
reasonably apparent to the person making the information available on the world wide web to be serious and imminent." Arizona and Colorado have passed similar statutes. *See* A.R.S. § 13-2401 and C.R.S. § 18-9-313. There are no reported cases from any of these jurisdictions regarding such restrictions.

[13]   Moreover, like the statute at issue in *The Florida Star v. B.J.F.*, the statute here punishes not the person or entity that initially made the restricted information publicly available, it punishes those who, having found such information in the public realm, pass the information on.  491 U.S. at 535. *See* Doc. 22, ¶13 ("This personal information regarding Officer Garrett was truthful and, at the time, publicly available. Plaintiff obtained this information through searches on the Internet.").

The defendants first defended the statute as proscribing threats. The

*Sheehan* court rejected the argument:

> [O]n its face, the statute does not purport to regulate true
> threats or any other proscribable mode of speech, but pure
> constitutionally-protected speech. Defendants cite no authority
> for the proposition that truthful lawfully-obtained, publicly-
> available personal identifying information constitutes a mode of
> constitutionally proscribable speech. Rather, disclosing and
> publishing information obtained elsewhere is precisely the kind
> of speech that the First Amendment protects.

*Id.* at 1141-42 (footnote and citation omitted). The defendants in *Sheehan*

cited no historical or anecdotal evidence indicating that the disclosure of

personal identifying information had a long and pernicious history as a signal

of impending violence, like the cross burning at issue in *Virginia v. Black*,

538 U.S. at 359, which might enable the court to regard it as a true threat.

The district court rejected the notion that revealing names, addresses and

phone numbers, coupled with a subjective intent to intimidate, could

transform pure speech into a true threat. 272 F.Supp.2d at 1143.

The defendants next argued that the statute only banned speech

lacking public significance and served the important state interests of

preventing harassment and retaliation. *Id.* at 1144. Citing *Florida Star*, the

district court rejected this argument, finding that the website, a vehicle of

mass communication, was analytically indistinguishable from a newspaper,

and that it communicated truthful, lawfully-obtained, publicly-available

personal identifying information with respect to a matter of public

significance – police accountability. *Id*. at 1145. The court noted that *Florida Star* also involved a concern with physical safety, that of crime victims who could be targeted for retaliation if their names become known to their assailants. *Id*. at 1145 (citing 491 U.S. at 537). The Supreme Court nevertheless held that "punishing the press for its dissemination of information which is already publicly available is relatively unlikely to advance the interests in the service of which the State seeks to act." *Florida Star*, 491 U.S. at 535. Finally, the *Sheehan* court noted that, under the statute, for-profit commercial entities remained perfectly free to sell, trade, give, or release personal identifying information to third-parties who intend to harm or intimidate individuals purportedly protected by the statute, making the statute significantly under-inclusive. *Sheehan*, 272 F.Supp.2d at 1145.

The court thus determined that the statute prohibited constitutionally protected speech based on content, and that its "with the intent to harm or intimidate" provision did not alleviate the constitutional problem. The court rejected the defendants' contention that the statute could be analyzed as a time, place and manner regulation aimed at the "secondary effects" of the speech, *i.e.* the potential harm to and intimidation of those covered by the law.

> [L]isteners' reactions to speech or the motive impact of speech on
> its audience is not a secondary effect. As plaintiff notes,

defendants' rationale would allow the secondary effects doctrine to completely swallow the First Amendment. It would grant the government a dangerous tool to proscribe any speech based solely on the government's speculation as to what harms might result from its utterance.

\* \* \*

Defendants assert a compelling state interest in protecting law enforcement-related, corrections officer-related, and court-related employees from harm and intimidation ... Any third party wishing to actually harm or intimidate these individuals may freely acquire the personal identifying information from myriad public and private sources, including for-profit commercial entities, without entering the scope of the statute. Yet, defendants argue, "Even the fact that an individual may gather the same information and use that information to harm someone does not detract from the state's compelling interest behind prohibiting the publication or distribution of such information with the intent to harm or intimidate." Thought-policing is not a compelling state interest recognized by the First Amendment.

*Id*. at 1146-47 (internal citations and footnotes omitted). The *Sheehan* court

concluded:

As the foregoing makes clear, the First and Fourteenth Amendments preclude the State of Washington from proscribing pure speech based solely on the speaker's subjective intent. Likewise, there is cause for concern when the legislature enacts a statute proscribing a type of political speech in a concerted effort to silence particular speakers. Defendants' position is troubling. Defendants boldly assert the broad right to outlaw any speech – whether it be anti-Semitic, anti-choice, radical religious, or critical of police – so long as a jury of one's peers concludes that the speaker subjectively intends to intimidate others with that speech. This brash stance strikes at the core of the First Amendment and does not comport with constitutional requirements. "[P]utting [certain individuals] in harm's way by singling them out for the attention of unrelated but violent third parties is [conduct] protected by the First Amendment." *Planned Parenthood* [*v. Am. Coalition of Life Activists*], 290 F.3d [1058,] 1063 [(9th Cir.2002)] . . . This Court does not intend to minimize

the real fear of harm and intimidation that law enforcement-related, corrections officer-related, and court-related employees, and their families, may experience. [J]udges and court employees are common targets of threats and harassment. However, we live in a democratic society founded on fundamental constitutional principles. In this society, we do not quash fear by increasing government power, proscribing those constitutional principles, and silencing those speakers of whom the majority disapproves. Rather, as Justice Harlan eloquently explained, the First Amendment demands that we confront those speakers with superior ideas:

> The constitutional right of free expression is powerful medicine in a society as diverse and populous as ours. It is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, in the hope that use of such freedom will ultimately produce a more capable citizenry and more perfect polity and in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests. To many, the immediate consequence of this freedom may often appear to be only verbal tumult, discord, and even offensive utterance. These are, however, within established limits, in truth necessary side effects of the broader enduring values which the process of open debate permits us to achieve. That the air may at times seem filled with verbal cacophony is, in this sense not a sign of weakness but of strength. We cannot lose sight of the fact that, in what otherwise might seem a trifling and annoying instance of individual distasteful abuse of a privilege, these fundamental societal values are truly implicated.

*Id*. at 1150 (quoting *Cohen v. California*, 403 U.S. 15, 24-25 (1971)). Fla. Stat.

§843.17 is unconstitutional on its face.

4.   THE STATUTE IS CONTENT BASED AND CANNOT SURVIVE
       STRICT SCRUTINY.

"The First Amendment generally prevents government from proscribing speech … because of disapproval of the ideas expressed. Content-based regulations are presumptively invalid." *R.A.V. v. City of St. Paul,* 505 U.S. 377, 382 (1992).

Fla. Stat. §843.17 is a content-based restriction on speech. In making the determination whether a statute is content-based or content-neutral, it is necessary to "look to the purpose behind the regulation." *Bartnicki v. Vopper,* 532 U.S. 514, 526 (2001). "As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based." *Turner Broad. Sys., Inc. v. FCC,* 512 U.S. 622, 643 (1994). Content-based restrictions are found where the statute's prohibition is "directed only at works with a specified content." *Simon & Schuster, Inc. v. N.Y. State Crime Victims Bd.,* 502 U.S. 105, 116 (1991). In contrast, content-neutral statutes are those which can be "justified without reference to the content of the regulated speech." *Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989). "[A] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Id.* at 791. Here, Fla. Stat. §843.17 is content-based because its purpose is to stifle speech of a particular content, namely, speech regarding a law enforcement officer's residence address or telephone number. *See Simon & Schuster,* 502

U.S. at 116. The district court in *Sheehan*, analyzing a Washington state statute substantially similar to Fla. Stat. §843.17,[14] addressed how the statute is content-based. *See* 272 F.Supp.2d at 1145-46. And, as set forth above, Florida's statute regulates pure speech because it does not reach only speech that may be proscribed under the First Amendment, such as true threats against specific individuals. Content-based restrictions[15] must be subjected to strict scrutiny. That is, the State must demonstrate that the "regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Boos v. Barry,* 485 U.S. 312, 321 (1988).

For the reasons set forth in Section II.C.2, *supra*, while the protection of law enforcement officers from bodily harm or death (or the credible fear of such harm) may be a compelling state interest, the challenged statute fails to require a true threat or a credible fear of bodily harm or death because of the

---

[14]   Washington's statute is set forth in *Sheehan* at 272 F.Supp.2d at 1139 and at p. 15, *supra*.

[15]   Florida's statute also discriminates upon the basis of the speaker's viewpoint. The statute reaches only a speaker with a subjective intent (ill will) regarding a law enforcement officer; a speaker seeking to praise an officer and encouraging others to write to her at her home address to show their support – and providing the address – would not be subject to punishment under the statute even though both speakers provide the identical information. Viewpoint discrimination is "an egregious form of content discrimination" where government "targets not subject matter, but particular views taken by speakers on a subject." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

proscribed speech. Thus, the statute is not narrowly drawn to achieve a compelling state interest and fails to survive strict scrutiny.

        5.     *FLA. STAT.* §843.17 IS VOID FOR VAGUENESS BECAUSE IT ALLOWS ARRESTING OFFICERS TO MAKE *AD HOC* DETERMINATIONS OF THE PURPOSE.

*Virginia v Black* held unconstitutional a Virginia statute insofar as it presumed intent to intimidate based solely on the burning of a cross; the presumption permitted both arrest and conviction for core political speech. Florida's statute empowers a police officer to arrest solely on the basis of publication, leaving to the officer's unfettered discretion whether the information was published with the intent set forth in the statute.  Just as a statute that permits a jury to convict solely on the basis of potentially protected speech is overbroad, a statute that lodges unguided discretion in police officers to arrest merely on the basis of speech is unconstitutionally vague. In *Foti v. City of Menlo Park*, 146 F.3d 629, 638 (9th Cir. 1998), the court considered an ordinance that prohibited parking with the intent to attract public attention to a sign void for vagueness because it required an enforcing officer to make an *ad hoc* determination of the purpose for which a car was parked. The court wrote that "to enforce the ordinance, a Menlo Park law enforcement officer must decipher the driver's subjective intent to communicate from the positioning of tires and the chosen parking spot." *Id*. The lack of standards for that determination rendered the statute

unconstitutionally vague. *Id. See also*, *Sheehan,* 272 F.Supp.2d 1135 (holding a nearly identical statute that forbade disclosure of officers' personal information with the "intent to harm or intimidate" void for vagueness because it required a similar determination of subjective intent); *Johnson v. Carson*, 569 F.Supp. 974, 979 (M.D. Fla. 1983); *Sult v. State*, 906 So.2d 1013, 1019 (Fla. 2005).

As the Supreme Court has noted:

> Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute "abut [s] upon sensitive areas of basic First Amendment freedoms," it "operates to inhibit the exercise of [those] freedoms." Uncertain meanings inevitably lead citizens to "'steer far wider of the unlawful zone' ... than if the boundaries of the forbidden areas were clearly marked."

*Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972) (citations omitted). These concerns are particularly evident where, as here, the enforcing officers are within the very class of persons the challenged statute is intended to benefit.

III.   *FLA. STAT.* §843.17 IS UNCONSTITUTIONAL AS APPLIED TO PLAINTIFF'S SPEECH.

Aside from the facial challenge, defendant Meggs' Motion to Dismiss does not address plaintiff's as-applied challenge. The specific speech for which plaintiff was prosecuted contains no constitutionally proscribable speech. The full posting subjecting plaintiff to prosecution was:

> Annette Pickett Garrett, 47 years old, 7 kids, Single, Divorced Anthony Edward "Tony" Drzewiecki, 38 yo, Home: 1929 Queenswood Drive, Tallahassee, Florida 32303-7123, Home Est. $167,500. Built in 1973, 1669 square feet. Cingular Cell-Phone: (850) 228-4567, E-Mail Address: AGARRETIOO@Comcast.net.

Doc. 22, ¶13. This message does not advocate that the reader do anything with this information, much less "inflict injury or tend to incite an immediate breach of the peace." It is not "likely to provoke violent reaction." Nor does it constitute a "true threat" by directing "a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." *Virginia v. Black*, 538 U.S. at 359-60. Hence, even if the statute were not facially invalid, it was unconstitutionally applied to plaintiff's speech.

Indeed, the application of the statute to plaintiff's posting of Garrett's name, address and phone number sweeps aside <u>any</u> requirement of a showing of what defendant Meggs claims is "a high level of scienter built into the provision." Motion to Dismiss, Doc. 34, p. 4. Rather, the statute was applied to plaintiff simply <u>because</u> he posted the name, address and telephone number of a Tallahassee Police Department officer (without specifically

identifying her as an officer in the same posting)[16] without regard to any level of scienter.[17] Thus, even if this Court determines that the statute is not facially unconstitutional, defendant Meggs' Motion to Dismiss should still be denied as to plaintiff's as-applied challenge.

IV. CONCLUSION.

*Fla. Stat.* §843.17 is unconstitutional on its face and as applied. Defendant Meggs' Motion to Dismiss (Doc. 34) must be denied. The statute should be declared unconstitutional on its face and its enforcement enjoined. Alternatively, the statute was unconstitutionally applied to plaintiff's speech.

---

[16]     Florida's criminal statutes must be strictly construed. *Fla. Stat.* §775.021(1); *Perkins v. State*, 576 So.2d 1310, 1312 (1991) ("One of the most fundamental principles of Florida law is that penal statutes must be strictly construed according to their letter. This principle ultimately rests on the due process requirement that criminal statutes must say with some precision exactly what is prohibited. Words and meanings beyond the literal language may not be entertained nor may vagueness become a reason for broadening a penal statute."). The fact that the name, address and phone number of Officer Garrett was posted on a website about police officers should not suffice to meet the statute's plain requirement that the publication or dissemination of the address or phone number be done "while designating the officer as such … ." Fla. Stat. §843.17.

[17]     The other postings by plaintiff were generally critical of Officer Garrett's performance as a police officer. Doc. 22, ¶10. Generalized criticism, coupled with the publication of her name, address and phone number, hardly rises to an exacting level of scienter. The statute could not be constitutionally applied to plaintiff's posting because his speech did not, as a matter of law, constitute a true threat or other category of speech that may be proscribed consistent with the First Amendment.

Respectfully submitted,

/s Randall C. Marshall

Randall C. Marshall, Esq.
Legal Director
American Civil Liberties Union
 Foundation of Florida, Inc.
4500 Biscayne Blvd., Ste. 340
Miami, FL  33137
(786) 363-2700
(786) 363-1108 (facsimile)
rmarshall@aclufl.org

James  K. Green, Esq.
JAMES K. GREEN, P.A.
Suite 1650, Esperantè
222 Lakeview Ave.
West Palm Beach, FL  33401
Florida Bar No:  229466
(561) 659-2029
(561) 655-1357 (facsimile)
jameskgreen@bellsouth.net

Anne Swerlick, Esq.
2425 Torreya Drive
Tallahassee, FL 32303
Phone:  (850) 385-7900 x 1813
Fax:  (850) 385-9998
anne@floridalegal.org

Cooperating Attorneys for the ACLU
Foundation of Florida, Inc. – Tallahassee
Chapter

COUNSEL FOR PLAINTIFF

<u>Certificate of Service</u>

I certify that the foregoing document was filed electronically on January 29, 2010, using the court's ECF system, which automatically serves counsel of record through electronic mail.

/s Randall C. Marshall

Randall C. Marshall